**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| ADAN SANCHEZ, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. H-11-3855 |
| § | |
| HACIENDA RECORDS AND § | |
| RECORDING STUDIO, INC., *et al.*, § | |
| § | |
| Defendants. § | |

**MEMORANDUM AND ORDER**

Adan Sanchez, a musician, sued Hacienda Records and Recording Studio, Inc., Hacienda Records, L.P., Latin American Entertainment, LLC, and various individual members of the Garcia family who own these entities (collectively, "Hacienda"). (Docket Entry No. 1). Sanchez alleged that Hacienda recorded and released *La Prieta Casada*, a song he wrote and to which he holds the copyright, without his permission. In an amended complaint, Sanchez added Leonardo Quiroz, Jedasa's current owner, as a defendant. The amended complaint asserted breach of contract and fraud claims in addition to copyright infringement. (Docket Entry No. 16). Hacienda responded that it recorded and released versions of *La Prieta Casada* under license obtained from Johnny Herrera, doing business as Jedasa Publishing Co. ("Jedasa"). Hacienda asserted that Jedasa was the publisher and copyright holder of *La Prieta Casada*.

On May 10, 2012, Hacienda moved to dismiss Sanchez's amended complaint. (Docket Entry No. 18). At a status conference held on May 11, 2012, this court granted the motion to dismiss Sanchez's fraud claims, converted the motion to dismiss the other claims to a motion for summary judgment, and allowed the parties to supplement the record after discovery. (Docket Entry No. 19). Hacienda moved for summary judgment, (Docket Entry No. 28); Sanchez responded, (Docket Entry

No. 31); Hacienda replied, (Docket Entry No. 41); Sanchez surreplied, (Docket Entry No. 47); and Hacienda responded, (Docket Entry No. 48).

Based on the pleadings, the motion and responsive briefing, the summary-judgment evidence, and the applicable law, this court denies Hacienda's motion for summary judgment. The reasons for this ruling are explained below.

**I.    Background**

Hacienda is an independent music-recording studio in Corpus Christi, Texas. The studio opened in 1979, specializing in Tejano music for a predominately Mexican-American audience. It is a family-run business owned and operated by Annie Garcia, Rick Garcia, and Rick Garcia's brother, Roland Garcia, Sr. (Docket Entry No. 28, Ex. M, June 29, 2012 Rick Garcia Aff., ¶¶ 1–2). Jedasa is a music publisher owned initially by Johnny Herrera and later by Leonardo Quiroz.

Adan Sanchez, the plaintiff, is a Tejano musician. He has a grade-school education and cannot read, write, or speak English. (Docket Entry No. 41, Ex. E, Sanchez Dep., at 11–13). He claims that he composed *La Prieta Casada*, a Tejano love song, in the 1970s. (*Id.* at 114). *La Prieta Casada* has been performed and recorded by numerous artists over the years. Some of those recordings were put out by Hacienda records. (*E.g.*, Docket Entry No. 28, Ex. I (documents and photocopies of discs showing recordings of *La Prieta Casada*)). This lawsuit concerns those recordings.

A copyright registration from 1976 shows Sanchez as *La Prieta Casada*'s author and Hererra and Jedasa as the song's publisher and copyright holder. (Docket Entry No. 41, Ex. U, at 20, 1976 Registration of Copyright; Docket Entry No. 31, Ex. B, at 3, 1976 Registration of Copyright). Another copyright registration from 1984 shows San Antonio Music Publishers ("SAMP") as the

copyright owner. (Docket Entry No. 41, Ex. N, at 18, 1984 Registration of Copyright; Docket Entry No. 31, Ex. B, at 6, 1984 Registration of Copyright). Yet another copyright registration from 1994 shows Sanchez as the copyright owner. (Docket Entry No. 31, Ex. B, at 8, 1994 Registration of Copyright). A 2004 registration renewal lists Adan Sanchez as the renewal copyright claimant and Jedasa as the original copyright owner. (Docket Entry No. 31, Ex. B, at 10, 2004 Renewal of Copyright).

Herrera died in 2003. After he died, Leonardo Quiroz took over Jedasa. (Docket Entry No. 28, Ex. M, ¶ 12). In 2010, Quiroz, acting on Jedasa's behalf, assigned Sanchez any interests it might have in various songs, including *La Prieta Casada*. The assignment agreement stated: "This assignment also includes and covers any and all claims, damages and causes of action by or against any party which in any way relate to or arise from the [songs], as well as the right to file suit, make claims and settle same on any terms Assignee deems advisable." The agreement was backdated to 2000. (Docket Entry No. 28, Ex. K, Quiroz/Jedasa Assignment). Sanchez paid Jedasa $5,000.00.

In October 2011, David Showalter, Sanchez's attorney, sent a letter to Hacienda demanding that it immediately stop unlicensed uses of the songs covered by the assignment agreement with Quiroz, including *La Prieta Casada*. (Docket Entry No. 28, Ex. J, Oct. 5, 2011 Letter from Showalter to Hacienda). The letter also demanded that Hacienda account for royalties due Sanchez, and purported to revoke any previous permission that may have been given to use the songs.

Hacienda sent a response to Showalter's letter. (Docket Entry No. 28, Ex. L, Oct. 13, 2011 Letter from Hacienda to Showalter). The response admitted that Hacienda had produced records with performances of *La Prieta Casada*. The response disputed that Sanchez had any rights to *La Prieta Casada*. In the response, Hacienda identified Juan Villareal as an individual listed on several

3

copyright databases as the song's composer. Hacienda also cited various music-industry sources it described as listing people other than Sanchez as owning the copyright to *La Prieta Casada*. Hacienda nevertheless sent Sanchez a check for royalties for recent uses of *La Prieta Casada*. Hacienda insists that this payment was not an admission but was made, "in a spirit of good will, time efficiency and an effort to do the right thing." (*Id.* at 3). Sanchez remained dissatisfied and this lawsuit followed.

The ownership history of the *La Prieta Casada* copyright is complicated. The copyright registrations described above appear to list different registered owners for what is apparently the same song. A notarized 1990 document that bears what purports to be Sanchez's signature states that he acknowledges Herrera as the sole publisher and copyright holder of *La Prieta Casada*. (Docket Entry No. 41, Ex. K, 1990 Sanchez Copyright Acknowledgment). In 1995, however, Sanchez sued Herrera and Jedasa in the United States District Court for the Southern District of Texas, Corpus Christi Division, alleging that Herrera did not own the rights to *La Prieta Casada* and was not authorized to register the copyright in his or in Jedasa's name. (Docket Entry No. 41, Ex. B, *Sanchez v. Herrera*, No. 2:95-cv-00245, Joint Pretrial Order). That lawsuit settled before trial or dispositive ruling.

The summary-judgment record contains some of the records from the 1995 lawsuit. One document purports to be a settlement agreement under which Herrera and Sanchez agreed to an equal division of the royalties from *La Prieta Casada*. (Docket Entry No. 41, Ex. E-7, Exhibit 7 to Sanchez Dep., at 4). This "Wrap Around Agreement" included a provision that Herrera would "remove his name as author of the Song, 'La Prieta Casada,' at the BMI registry," and that Herrera and Sanchez would "execute whatever documents necessary in order to perfect filings or clarify their

50/50 ownership of the songs [sic] proceeds to third parties." (*Id.*). This agreement was signed by Herrera but not by Sanchez.

In his deposition in the present lawsuit, Sanchez tried to explain the murky ownership record of *La Prieta Casada*. As he apparently did in the 1995 lawsuit, Sanchez explained that Herrera had tricked or misled him into allowing the 1976 copyright to be registered in Herrera's name. (Docket Entry No. 41, Ex. E, at 27–28). Sanchez thought that the 1984 registration by San Antonio Music Publishers was a formality needed only to collect some song royalties in Mexico. (*Id.* at 143–45). Sanchez denied having authorized SAMP to file a copyright in its name for *La Prieta Casada*. (*Id.* at 30). Sanchez recalled having seen the 1990 document that purported to recognize Herrera's exclusive rights to *La Prieta Casada*. According to Sanchez, Herrera had prepared the document but Sanchez had refused to sign it. Although the document bears what purports to be Sanchez's signature, Sanchez testified that the signature was not his. (*Id.* at 87–104). The document is, however, notarized, and the notary has submitted an affidavit stating that the signature was executed by a person claiming to be Adan Sanchez, and carrying photo identification. (Docket Entry No. 41, Ex. L, Sandbach Aff.). Sanchez explained that the 1994 registration was an attempt to end the dispute and establish, once and for all, that he owned the *La Prieta Casada* copyright. (Docket Entry No. 41, Ex. E, at 149–53, 161–62). He denied agreeing to divide ownership of certain songs with Jedasa to settle the 1995 lawsuit. (*Id.* at 107–08). Sanchez also denied that the 2010 agreement showed that Quiroz, Herrera, or Jedasa ever had an ownership interest in *La Prieta Casada*. Rather, Sanchez testified that he had always been the true copyright owner and the agreement merely showed that Jedasa was abandoning any claims to the contrary. (*Id.* at 163–64). Sanchez did not know why the agreement was backdated to 2000. (*Id.* at 123).

Hacienda argued that it is not liable for copyright infringement because its recordings of *La Prieta Casada* were under either express written licenses or a general negotiated implied license. Hacienda asserts that when it opened in 1978, Herrera approached Rick Garcia with an offer for Hacienda to use Jedasa's entire music catalog, including *La Prieta Casada*. In exchange, Hacienda would provide Herrera with records to sell in his music shop. Hacienda described this agreement as a "negotiated implied license." (Docket Entry No. 28, Ex. M, ¶ 5).

The summary-judgment evidence does not include any writing in which Herrera or Jedasa granted Hacienda a license to use Jedasa's entire catalog. The record includes some documents that appear to be individual licenses by Jedasa to Hacienda for specific Hacienda recordings of *La Prieta Casada* by certain artists. (Docket Entry No. 18, Ex. A, pt. 1, Jedasa Licensing Documents; Docket Entry No. 28, Ex. I, at 4, Albert Zamora Y Talento License for *La Prieta Casada*). Hacienda does not claim that these licenses cover all the recordings it made of *La Prieta Casada*. As to those recordings for which there is no specific written license, Hacienda stated that its business dealings with Jedasa were often informal, and that these informal dealings gave rise to one or more general implied licenses.

Hacienda submitted an affidavit by Rick Garcia, stating as follows:

> From time to time, Jedasa would send a written license to Hacienda for permission to use a particular song on a particular album, including Prieta Casada, and from time to time Hacienda would send a written license to Jedasa for the same. Not all such written records can be located at this time . . . . But Jedasa and Hacienda always had their course of dealing and course of performance of Jedasa granting a negotiated implied license to Hacienda for permission to use Jedasa songs for all purposes, including Prieta Casada, and Hacienda providing either cash or product trade-out for the negotiated mechanical royalties for the use of all Jedasa songs for all purposes, including Prieta Casada.

(Docket Entry No. 28, Ex. M, ¶ 9 (citations omitted)).

Hacienda argued that these implied licenses from Jedasa, the song's publisher, mean that it cannot be liable for copyright infringement as a matter of law because its recordings of *La Prieta Casada* were licensed. (*Id.* at 10, 28).[1] Hacienda argued that Sanchez cannot prove otherwise because: (1) Sanchez was not present when Herrera granted Hacienda the "negotiated implied license" and cannot contradict it; (2) Sanchez cannot prove that he — as opposed to Herrera or Jedasa or some other entity — held the copyright to *La Prieta Casada* before the 2010 transfer agreement with Quiroz; (3) Sanchez's 1994 attempt to register the copyright in his own name was invalid; and (4) Sanchez knew that Hacienda was recording and releasing versions of *La Prieta Casada* over the years but never complained until 2011. (*Id.* at 17–18).[2] Hacienda argued that whatever ownership interest Sanchez might currently have in *La Prieta Casada* is not relevant to recordings Hacienda made before 2011, when Showalter sent his demand letter. (*Id.* at 18).

Hacienda asserted as additional grounds for summary judgment that Sanchez's claims were

---

[1] Hacienda argued that Sanchez has judicially admitted that Jedasa was his publisher. (Docket Entry No. 41, at 5–6). This argument is based on allegations in Sanchez's complaint in this suit and in the 1995 lawsuit that Jedasa was the publisher of *La Prieta Casada*. It is not clear whether, or to what extent, the fact that Jedasa may have been Sanchez's publisher bears on the copyright-ownership issues in this case. Hacienda appeared to acknowledge that these are two distinct issues: "Whether Jedasa was or was not the publisher of the song, Jedasa clearly owned the copyright to the song and had full authority to license its use to Hacienda." (*Id.* at 6).

[2] In its reply brief, (Docket Entry No. 41, at 1–2), and its response to Sanchez's surreply, (Docket Entry No. 48, at 1–2), Hacienda has also objected to various statements in an affidavit sworn by Sanchez, which he attached to his response to Hacienda's motion for summary judgment, (Docket Entry No. 31, Ex. K, Sanchez Aff.). The objectionable statements largely mirror Sanchez's deposition testimony on the ownership of the *La Prieta Casada* copyright. Hacienda complains that the statements are an impermissible attempt to create "sham" issues of fact and that they state impermissible legal conclusions. The objections are overruled. This court does not view or rely on the statements as conclusions of law. And the summary-judgment record does not entitle Hacienda to judgment as a matter of law for reasons unrelated to the statements that are objected to.

barred by estoppel and waiver, (*id.* at 18–19); that the license it had with Jedasa could not have been unilaterally rescinded by Sanchez through Showalter's 2011 letter; and that Sanchez could not base a breach of contract claim on Hacienda's alleged failure to comply with Jedasa licenses. (*Id.* at 20–22). Finally, Hacienda argued that the individual defendants must be dismissed because Sanchez had not shown that they acted wrongfully or outside the scope of their employment. (*Id.* at 22–24).

These arguments, and Sanchez's responses, are discussed below in light of the legal standards and the summary-judgment evidence.

## II.   The Summary-Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."

*United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008)

### III. Analysis

"To maintain a copyright infringement claim, the owner of the copyright must have registered it. *Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.*, 226 F.3d 387, 392 (5th Cir. 2000) (citing 17 U.S.C. § 411(a)). "An action for copyright infringement requires the plaintiff to show 'ownership' of the material and 'copying' of the material by the defendant." *Id.* at 392–93 (citing *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991). To establish the "ownership" element, the plaintiff must show that the material is original and can be copyrighted, and that the plaintiff has complied with all statutory formalities. The "copying" element is met by proving "(1) factual copying and (2) substantial similarity." *Id.* at 393 (quoting *Lakedreams*, 932 F.2d at 1107); *see also Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) ("To prove copyright infringement a party must show that '(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.'" (quoting *Positive Black Talk Inc. v.*

9

*Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010))).

"'A copyright owner may grant a license in his work, thereby waiving his right to sue the licensee for copyright infringement.'" *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 771 (N.D. Tex. 2006) (quoting *Pavlica v. Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005)). "[T]he existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 451 n.5 (5th Cir. 2003). Such a license may be either exclusive or nonexclusive; if exclusive, it must be in writing. *See id.*; *see also Ramirez v. Nichols*, 2012 WL 5377683, at *1 (5th Cir. Nov. 12, 2012) ("An exclusive license is a transfer of copyright ownership and must be memorialized in a signed writing." (citing 17 U.S.C. §§ 101, 204(a))). A license "may be implied from conduct or granted orally." *Carson*, 344 F.3d at 451 n.5 (citing *Lulirama Ltd. v. Axcess Broad. Sys., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997)). The defendant has the burden of proving that a license exists. *Id.*; *see also Ramirez*, 2012 WL 5377683, at *1 ("Defendants maintain they had either an exclusive or implied license to exploit Ramirez' and Guerrero's works. The burden is on Defendants to prove having a license because it is an affirmative defense to a copyright-infringement claim."); *Lulirama*, 128 F.3d at 884 (citing *CMS Software Design Sys., Inc. v. Info Designs, Inc.*, 785 F.2d 1246, 1248 (5th Cir. 1986)).

An implied license arises when: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama*, 128 F.3d at 879. The critical element for finding an implied license is intent. *Straus v. DVC*

*Worldwide, Inc.*, 484 F. Supp. 2d 620, 644 (S.D. Tex. 2007) (citing *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003)). "Without intent [to permit the use], there can be no implied license." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). Courts have found implied licenses only in "narrow" circumstances, in which one party "created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990); *see also Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999) (determining that the plaintiff gave the defendant radio station an implied, nonexclusive license to use jingles she had written for the station to use). Disputed issues of intent to create an implied license may preclude summary judgment. *E.g.*, *Aillet, Fenner, Jolly & McClelland, Inc. v. U.L. Coleman Co.*, 2012 WL 4450977, at *2 (W.D. La. Sept. 25, 2012) ("The issue of AFJM's intent is fiercely contested. If factual issues or conflicting inferences exist, the court is not to resolve them; rather, summary judgment must be denied." (citing *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1016 (5th Cir. 1990))); *Isbell v. DM Records, Inc.*, 2012 WL 369246, at *7 (E.D. Tex. Feb. 3, 2012) ("[T]he undisputed facts of this case do not at this point satisfy the criteria . . . for creation of a non-exclusive implied license. DM has produced no evidence alleging that Isbell was the 'creator' of the work and 'intend[ed] that the licensee-requestor copy and distribute his work,' as is required to establish and implied non-exclusive license.").

The present case is essentially a dispute over whether Hacienda had valid licenses to use *La Prieta Casada* in various recordings and musical compilations that it produced for sale. Hacienda relies on an implied license from Jedasa for most of the recordings at issue, and written licenses for a few of the recordings. Years after Hacienda received this alleged implied license and the written

11

licenses, Sanchez appeared, purported to revoke any previous permission to use *La Prieta Casada*, asserted that any unauthorized use of that song was infringing, and sued Hacienda for copyright infringement. When Hacienda argued that its recordings of *La Prieta Casada* were licensed, either explicitly or implicitly, by Jedasa, Sanchez claimed that Jedasa never had any right to license Hacienda to use the song.

Hacienda's summary-judgment arguments focus on the existence and validity of the umbrella "negotiated implied license" from Herrera and Jedasa. Hacienda argued that it produced recordings that included *La Prieta Casada* under license and that it has shown that Herrera had the authority to grant such a license. The authority is based on evidence that Herrera's company, Jedasa, was the registered copyright owner of *La Prieta Casada* in 1978. In response, Sanchez asserted that Herrerra and Jedasa were never the true copyright owners because Herrera misled or tricked him into believing that Hererra had copyrighted *La Prieta Casada* in Sanchez's name, when in fact he had not. Sanchez points to his different efforts over an extended period to correct registrations that did not show him as the copyright owner. The parties produced voluminous records and briefing relating to whether Sanchez or Herrera was the true copyright owner over the years.

Ownership is, of course, an essential element of Sanchez's copyright-infringement claim. But Hacienda does not dispute the record evidence that Sanchez owns the copyright to *La Prieta Casada* at this time. Jedasa has assigned whatever rights and claims it has to the song to Sanchez, although the parties dispute the effective date of that assignment. Hacienda has the burden as the summary-judgment movant to show that the record evidence entitles it to judgment as a matter of law on its affirmative defense that its recordings of *La Prieta Casada* were under valid licenses. To be entitled to summary judgment on this basis, Hacienda must show undisputed evidence that Jedasa

had the right to grant the licenses and that the scope of those licenses included the recordings of *La Prieta Casada* at issue. The arguments as to whether Sanchez or Herrera/Jedasa owned the copyright to *La Prieta Casada* relate to the first issue. The record discloses disputed evidence about whether Herrera did own the copyright for *La Prieta Casada* and, assuming that he did, whether and to what extent Herrera licensed the right to record that song to Hacienda.

The present record does not show, as a matter of law, an implied license of the scope Hacienda describes. Herrera is dead. Sanchez has presented competent summary-judgment evidence, including his own affidavit and deposition testimony stating that Herrera defrauded him in the initial copyright registration, and documents showing Sanchez's efforts to correct the registration to show that he owned the song's copyright. There are disputed facts, turning at least in part on credibility judgments, material to determining whether Herrera owned the copyright to *La Prieta Casada* and, if he did, whether he obtained the copyright by defrauding Sanchez.

Hacienda has produced some written licenses from Jedasa for recordings of *La Prieta Casada*, but there are disputed facts material to determining whether Herrera and Jedasa had the right to issue the written licenses for Hacienda to record *La Prieta Casada*. For the recordings of the song made without any written license, Hacienda relies on Herrera's implied oral agreement to allow Hacienda to use Jedasa's entire catalog of music. There are disputed facts material to determining whether Hacienda had an implied license to use *La Prieta Casada* and whether Herrera or Jedasa had a right to grant any such license. The "negotiated implied license" Hacienda claimed for all its uses of *La Prieta Casada* is disputed in ways that also require credibility judgments to resolve. In light of the burden Hacienda bears to establish its affirmative defense of license, summary judgment based on the combination of some express licenses and a general implied license

is not appropriate on the current record.

Summary judgment is also inappropriate based on Hacienda's other arguments. Estoppel and waiver, like license, are affirmative defenses. *E.g.*, *Isbell*, 2012 WL 369246, at *6 (estoppel); *Wood v. BL Bldg. Co.*, 2004 WL 5866352, at *21 (S.D. Tex. June 22, 2004) (waiver). Based on the record described above, this court cannot conclude that Hacienda has established those defenses as a matter of law. The evidence as to Sanchez's efforts over time to correct the copyright registration and the various agreements purporting to transfer rights and claims to the copyright, with the credibility issues about whether Herrera fraudulently obtained ownership to the song and whether he granted an implied license to Hacienda to use that song, preclude summary judgment based on estoppel and waiver.

Hacienda's arguments about the invalidity of Sanchez's purported license rescission and breach of license are similarly unsuited for summary judgment. Those arguments also depend on the threshold issues relating to whether there was a valid license between Jedasa and Hacienda and the extent of any such license.

Finally, summary judgment is not appropriate on the claims against the individual defendants. A controlling corporate officer or shareholder may be vicariously liable for infringement along with his or her corporation, despite any immunity provided by state corporation law. *See, e.g.*, *Broad. Music, Inc. v. Hobi, Inc.*, 20 F.3d 1171, 1994 WL 144812, at *2 (5th Cir. Apr. 8, 1994) (per curiam) (unpublished); *Realsongs v. Gulf Broad. Corp.*, 824 F. Supp. 89, 91–92 (M.D. La. 1993); *Fermata Int'l Melodies, Inc. v. Champions Golf Club, Inc.*, 712 F. Supp. 1257, 1261–62 (S.D. Tex. 1989), *aff'd* 915 F.2d 1567 (5th Cir. 1990); *Red Giant, Inc. v. Molzan, Inc.*, 2009 WL 2242349, at *5 (S.D. Tex. July 24, 2009). "A corporate officer may be held vicariously liable (1) if the officer

has a financial stake in the activity and (2) if the officer has the ability and right to supervise the activity causing infringement." *Fermata Int'l Melodies*, 712 F. Supp. at 1262; *accord Broad. Music*, 1994 WL 144812, at *2; *Red Giant*, 2009 WL 2242349, at *5. Hacienda admits that it is a closely held, family-run business. The summary judgment evidence does not permit this court to find, as a matter of law, that the individual defendants exercised no authority over the matters relevant to this lawsuit, had no financial stake in the alleged infringing activity, or had no ability and right to supervise that activity.

Accordingly, Hacienda's motion for summary judgment must be denied.

## IV. Conclusion

Hacienda's motion for summary judgment is denied. A status conference is set for **March 5, 2013** at 9:00 a.m. in Courtroom 11-B. The parties must confer and come prepared to discuss a sensible plan for completing the pretrial work and trying the case in a reasonable, cost-effective, efficient manner, so that the case is resolved on the basis of the strengths and weaknesses of the merits, not on the costs or burdens of the remaining preparation and trial.

SIGNED on February 11, 2013, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge