IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ADAN SANCHEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-3855 |
| | § | |
| HACIENDA RECORDS AND | § | |
| RECORDING STUDIO, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

This copyright-infringement action is over a song called *La Prieta Casada*. Adan Sanchez sued Hacienda Records, L.P., Latin American Entertainment LLC, Annie Garcia, Roland Garcia, Sr., and Rick Garcia (together, "Hacienda"),[1] alleging that Sanchez owned the song's copyright and that the defendants had recorded and distributed the song without his authorization. (Docket Entry No. 16). Hacienda asserted that it used the song with the rightful copyright owner's permission. Hacienda filed a second summary judgment motion on January 31, 2014, arguing that limitations bars Sanchez's suit. (Docket Entry No. 83). Sanchez responded, Hacienda replied, and Sanchez surreplied. (Docket Entry Nos. 88, 89, 99). Based on the pleadings, the motion and response, the briefs, the summary judgment evidence, and the applicable law, this court grants Hacienda's motion for summary judgment. By **September 8, 2014**, the parties must file either a statement identifying any issues that remain to be resolved or a proposed form of final judgment.

The reasons for this ruling are explained below.

---

[1] Latin American Entertainment, LLC, is the general partner of Hacienda Records. (Docket Entry No. 16 ¶ 12). Annie Garcia, Roland Garcia, Sr., and Rick Garcia are the founders, owners, directors and officers of Hacienda Records, Latin American Entertainment, and other associated companies. (*Id.*).

# I.     Factual and Procedural Background

The factual background is set out in the February 11, 2013 Memorandum and Opinion, (Docket Entry No. 49), and only briefly summarized below.  Hacienda is an independent music-recording studio located in Corpus Christi, Texas.  The studio opened in 1979, specializing in Tejano music for a predominately Mexican-American audience.  It is a family-run business, owned and operated by Annie Garcia, her husband Rick, and Rick's brother, Roland Sr.  (*See* Docket Entry No. 28, Ex. M ¶¶ 1–2).  Jedasa is a music publisher initially owned by Johnny Herrera and later by Leonardo Quiroz.

Adan Sanchez, the plaintiff, is a Tejano musician.  He has a grade-school education and cannot read, write, or speak English.  (Docket Entry No. 41, Ex. E at 11–13, 42).  He claims that he composed *La Prieta Casada*, a Tejano love song, in the 1970s.  (*Id.* at 114).  Numerous artists over the years have recorded *La Prieta Casada*.  Hacienda recorded and distributed some of these recordings.  (*E.g.*, Docket Entry No. 28, Ex. I). This lawsuit concerns Hacienda's recordings.

*La Prieta Casada* has been the subject of multiple and inconsistent copyright registrations since 1976.  A 1976 copyright registration shows Sanchez as *La Prieta Casada*'s author.  This 1976 registration identifies the publisher and copyright holder as Jedasa Publishing Co. and its owner, Johnny Herrera.  (Docket Entry No. 41, Ex. U at 19; Docket Entry No. 31, Ex. B at 3).  Another copyright registration, from 1984, shows San Antonio Music Publishers[2] as the copyright owner.  (Docket Entry No. 41, Ex. N at 1; Docket Entry No. 31, Ex. B at 6).  A notarized 1990 document bearing what purports to be Sanchez's signature states that he acknowledges Herrera as the sole publisher and copyright holder of *La Prieta Casada*.  (Docket Entry No. 41, Ex. K).  Yet another copyright registration from 1994 shows Sanchez as the

---

[2] San Antonio Music's relationship to Hacienda, Jedasa, and Sanchez is unclear.

copyright owner.  (Docket Entry No. 31, Ex. B at 8).  A 2004 registration renewal lists Adan

Sanchez as the renewal copyright claimant and Jedasa as the original copyright owner.  (*Id.*, Ex.

at 10).

Herrera died in 2003, and Leonardo Quiroz took over Jedasa.  (Docket Entry No. 28, Ex.

M ¶ 12).  In 2010, Quiroz, acting on Jedasa's behalf, assigned Sanchez any interests Jedasa

might have in various songs, including *La Prieta Casada*.  The assignment agreement stated:

> This assignment also includes and covers any and all claims,
> damages and causes of action by or against any party which in any
> way relate to or arise from the [songs], as well as the right to file
> suit, make claims and settle same on any terms Assignee deems
> advisable.

 (Docket Entry No. 28, Ex. K at 1).  The agreement was backdated to 2000.  (*Id.*).  Sanchez paid

Jedasa $5,000.00.  (*Id.*, Ex. K at 5).

In October 2011, David Showalter, Sanchez's attorney, wrote Hacienda a letter

demanding that it immediately stop unlicensed uses of all the songs that the assignment

agreement covered, including *La Prieta Casada*.  (Docket Entry No. 28, Ex. J).  The letter also

demanded that Hacienda account to Sanchez for royalties for unlicensed uses and purported to

revoke any previous permission that may have been given to use the song.

Hacienda responded to Showalter's letter.  (Docket Entry No. 28, Ex. L at 2).  The

response admitted that Hacienda had produced recordings of *La Prieta Casada*, but disputed

whether Sanchez held the copyright for the song.  Hacienda also cited various music-industry

sources it described as listing people other than Sanchez as owning the song's copyright.

Hacienda pointed to the website of the "Sociedad De Autores y Compositores de Mexico,"

which appears to be an entity that manages Mexican copyrights, showing Juan Villareal as the

composer of *La Prieta Casada.* The website also features other artists crediting Villareal as the

song's composer.  (*Id.*).  Hacienda nevertheless sent Sanchez a check in the amount of $227.50 for royalties for recent uses of *La Prieta Casada,* "in a spirit of good will, time efficiency and an effort to do the right thing."  (*Id.*).[3]  This lawsuit followed.

As the multiple copyright registrations reflect, the ownership history of *La Prieta Casada* makes identifying the owner difficult.  This is the second lawsuit involving this song.  In June 1995, Sanchez sued Herrera and Jedasa in the United States District Court for the Southern District of Texas, Corpus Christi Division, alleging that Herrera did not own the rights to *La Prieta Casada* and was not authorized to register the copyright on behalf of himself or Jedasa. (*See* Docket Entry No. 41, Ex. B, *Sanchez v. Herrera*, No. 2:95-cv-00245, Joint Pretrial Order). That lawsuit settled before trial or dispositive ruling.  The settlement terms are unclear.  In one document purporting to be a settlement agreement, Herrera and Sanchez agreed to an equal division of any royalties from *La Prieta Casada*.  (*Id.*, Ex. E-7 at 4).  This "Wrap Around Agreement" included a provision that Herrera would "remove his name as author of the Song, 'La Prieta Casada,' at the BMI registry," and that Herrera and Sanchez would "execute whatever documents [are] necessary in order to perfect filings or clarify their 50/50 ownership of the songs [sic] proceeds to third parties."  (*Id.*).  This agreement shows Herrera's signature, but the signature line for Sanchez is blank.  (*Id.*).

In his deposition in the present lawsuit, Sanchez tried to explain *La Prieta Casada*'s ownership history.  As he apparently did in the 1995 lawsuit, Sanchez took the position that

---

[3] The record is unclear as to the number of recordings of *La Prieta Casada* that Hacienda sold.  An exhibit Hacienda submitted with its first motion for summary judgment shows that between 2008 and June 2012, Hacienda sold about 45,000 units of *La Prieta Casada*.  (Docket Entry No. 28, Exs. A, B).  Many (14,265 recordings) were Albert Zamora's recording that Hacienda released on a 25-song-compilation album called *Tejano Classics VI*.  (*Id.*, Ex. A). Under 17 U.S.C. § 504(b), actual damages must be suffered "as a result of the infringement," and recoverable profits must be "attributable to the infringement."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004), (internal quotations omitted), *opinion amended on denial of reh'g*, No. 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004).  Assuming infringement and no limitations, Sanchez would be required to show, for example, how many sales of *Tejano Classics VI* were attributable to *La Prieta Casada*.  Hacienda implies that such sales would be minimal.

Herrera had tricked or misled him into allowing the 1976 copyright to be registered in Herrera's name.  (*See id.*, Ex. E, at 27–29).  Sanchez thought that the 1984 registration by San Antonio Music was a formality needed only to collect some song royalties in Mexico.  (*Id.* at 143–45).  Sanchez denied having authorized San Antonio Music to file a copyright in its name for *La Prieta Casada*.  (*Id.* at 30).  Sanchez recalled having seen the 1990 document that purported to recognize Herrera's exclusive rights to *La Prieta Casada*.  According to Sanchez, Herrera had prepared the document but Sanchez had refused to sign it.  Although the document bears what purports to be his signature, Sanchez testified that the signature was not his.  (*Id.* at 87–104).  The document is, however, notarized, and the notary submitted an affidavit stating that the signature was executed by a person claiming to be Adan Sanchez and carrying photo identification.  (*Id.*, Ex. L).

Sanchez testified in his deposition that the 1994 registration was an attempt to end the dispute and establish, once and for all, that he owned the *La Prieta Casada* copyright.  (*See* Docket Entry No. 41, Ex. E at 149–53, 161–62).  He denied agreeing to divide ownership of certain songs with Jedasa to settle the 1995 lawsuit.  (*Id.*, Ex. E at 107–08).  Sanchez also denied that the 2010 agreement showed that Quiroz, Herrera, or Jedasa ever had an ownership interest in *La Prieta Casada*.  Rather, Sanchez testified that he had always been the true copyright owner and the agreement merely showed that Jedasa was abandoning any contrary claims.  (*Id.*, Ex. E at 163–64).  Sanchez did not know or explain why the agreement was backdated to 2000.  (*Id.*, Ex. E at 123–24).

Hacienda argues in response that it is not liable for copyright infringement because it recorded *La Prieta Casada* under either express written licenses or a general negotiated implied license.  Hacienda asserts that when it opened in 1978, Herrera approached Rick Garcia with an

offer for Hacienda to use Jedasa's entire music catalog, including *La Prieta Casada*.   In exchange, Hacienda would provide Herrera with records to sell in his music shop.   Hacienda described this agreement as a broad "negotiated implied license."  (Docket Entry No. 28, Ex. M ¶ 5).

The record evidence does not include any writing in which Herrera or Jedasa granted Hacienda a license to use Jedasa's entire catalog.  The record does include some documents appearing to be express licenses from Jedasa granting Hacienda the right to distribute recordings of *La Prieta Casada* by certain artists.  (Docket Entry No. 18, Ex. A, pt. 1; Docket Entry No. 28, Ex. I at 3).   These licenses name Sanchez as the song's author, not the copyright holder.  Hacienda claims that these express licenses cover some of the recordings it made of *La Prieta Casada*, but not all.  As to those recordings for which there is no specific written license from Jedasa, Hacienda explained that its business dealings with Jedasa were often informal and its contracts often oral.  Hacienda asserts that these informal dealings and exchanges gave rise to one or more general implied licenses to record Jedasa's songs, including *La Prieta Casada*.

Hacienda submitted an affidavit by Rick Garcia, stating as follows:

> From time to time, Jedasa would send a written license to Hacienda for permission to use a particular song on a particular album, including *Prieta Casada*, and from time to time Hacienda would send a written license to Jedasa for the same.  Not all such written records can be located at this time . . . .  But Jedasa and Hacienda always had their course of dealing and course of performance of Jedasa granting a negotiated implied license to Hacienda for permission to use Jedasa songs for all purposes, including *Prieta Casada*, and Hacienda providing either cash or product trade-out for the negotiated mechanical royalties for the use of all Jedasa songs for all purposes, including *Prieta Casada*.

(Docket Entry No. 28, Ex. M ¶ 9 (italics added; citations omitted)).

In an earlier summary-judgment motion, Hacienda argued that these negotiated and implied licenses from Jedasa, the song's publisher, mean that it cannot be liable for copyright infringement as a matter of law because its recordings of *La Prieta Casada* were licensed. (Docket Entry No. 28 at 16–18).  Hacienda argued that Sanchez was not present when Herrera granted Hacienda the implied licenses and cannot dispute them.  Hacienda also argued that Sanchez cannot show that he — as opposed to Herrera, Jedasa, or some other entity — held the copyright to *La Prieta Casada* before the 2010 transfer agreement with Quiroz.  Hacienda argued that Sanchez's 1994 attempt to register the copyright in his own name was invalid as a matter of law.

Hacienda also argued that Sanchez knew that it was recording and releasing versions of *La Prieta Casada* over the years but never complained until 2011.  Hacienda argued that whatever ownership interest Sanchez might currently have in *La Prieta Casada* is not relevant to recordings Hacienda made before 2011, when Showalter sent his demand letter.  (*Id.* at 18) Hacienda asserted that Sanchez's claims were barred by estoppel and waiver; that the license it had with Jedasa could not have been unilaterally rescinded by Sanchez through Showalter's 2011 letter; and that Sanchez could not base a breach of contract claim on Hacienda's alleged failure to comply with licenses Jedasa granted to Hacienda. (*Id.* at 18–22).  Finally, Hacienda argued that the individual defendants must be dismissed because Sanchez had not shown that they acted wrongfully or outside the scope of their employment.  (*Id.* at 22–24).

The court denied Hacienda's earlier summary-judgment motion because the record did not allow the court to find as a matter of law that Hacienda did not infringe rights Sanchez may have in the song.  (Docket Entry No. 49).  The court denied the motion as to the individual defendants because their financial stake in the alleged infringing activity and their right to

supervise that activity remained unclear.   (*Id.*).   Hacienda subsequently sought and obtained

leave to file an additional summary-judgment motion arguing that Sanchez's claims are time-

barred.   (Docket Entry No. 78).   Hacienda filed the motion, Sanchez responded, Hacienda

replied, and Sanchez surreplied.  (Docket Entry Nos. 83, 88, 89, 99).

     The arguments and responses are analyzed below.

## II.    The Summary Judgment Standard

     Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(a).   "The movant

bears the burden of identifying those portions of the record it believes demonstrate the absence

of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th

Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

     If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its

initial burden by "'showing' — that is, pointing out to the district court — that there is an

absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Although the party moving for summary judgment must demonstrate the absence of a genuine

issue of material fact, it does not need to negate the elements of the nonmovant's case.

*Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).   "A fact is 'material' if its

resolution in favor of one party might affect the outcome of the lawsuit under governing law."

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir.  2009) (quotation omitted).

"If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must

be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S.*

*Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Analysis

### A.    The Limitations Period for Copyright Infringement Claims

"Copyright infringement claims have two basic elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251,1254 (9th Cir. 2013) (internal quotation marks omitted). The Copyright Act of 1976 provides that all civil actions must be brought "within three years after the claim accrued." 17 U.S.C. § 507(b). The accrual date depends on whether the basis of the claim is ownership or copying. "In the ordinary infringement case, ownership is not in dispute." *Seven Arts*, 733 F.3d at 1254. In those cases, "each act of infringement gives rise to an independent claim, and the defendant 'is only liable for his acts of infringement committed within three years prior to [p]laintiff's lawsuit.'" *Jaso v. Coca Cola Co.*, 435 F. App'x 346, 352 (5th Cir. 2011) (unpublished) (emphasis removed) (quoting *Makedwde Publ'g Co. v. Johnson*, 37 F.3d 180, 182 (5th Cir. 1994)). This is "[b]ecause

each act of infringement is a distinct harm." *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004).

"[W]here the gravamen of a copyright infringement suit is ownership, and a freestanding ownership claim would be time-barred, any infringement claims are also barred." *Seven Arts*, 733 F.3d at 1255. "[C]laims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation." *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). Unlike copyright-infringement claims, a copyright-ownership claim "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007).

Hacienda relies on *Seven Arts*, a case in which a motion-picture company sued Paramount Pictures for copyright infringement. *Id.* at 1252. Paramount had obtained licenses for certain distribution rights in Seven Arts's motion pictures and had paid royalties to a company called Content Media, which Paramount asserted owned the copyrights. *See id.* at 1252, 1254. Paramount had allegedly infringed within the three years before Seven Arts sued in 2011, but the ownership dispute had existed since at least 2002, when Seven Arts sued Content Media's predecessor-in-interest. *See id.* at 1252, 1258. The Ninth Circuit held that Seven Arts's infringement claim against Paramount was time-barred because the "gravamen" of the claim was ownership. *Id.* at 1258. All infringement claims accrued in 2002, the year Seven Arts sued Content Media's predecessor-in-interest claiming rights in the motion pictures. *See id.* at 1252–53, 1257. Seven Arts's 2011 lawsuit was time-barred, despite the acts of alleged infringement well past 2002.

The Second and Sixth Circuits are consistent with *Seven Arts*.  In *Kwan v. Schlein*, 634 F.3d 224, 230 (2d Cir. 2011), the Second Circuit stated that "[w]here, as here, the ownership claim is time-barred, and ownership is the dispositive issue, any attendant infringement claims must fail."  The Sixth Circuit held in *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389–90 (6th Cir. 2007), that "[w]hen claims for both infringement and ownership are alleged, the infringement claim is timely only if the corresponding ownership claim is also timely."  No other circuit decision conflicts with *Seven Arts*.  *Cf. Seven Arts*, 733 F.3d at 1256 ("We decline Seven Arts's invitation to create a circuit split.").

Sanchez contends that the Second, Sixth, and Ninth Circuit cases are inconsistent with Fifth Circuit case law.  He cites an unreported case, *Jaso v. Coca-Cola Company*, 435 F. App'x 346 (5th Cir. 2011).  In *Jaso*, the Fifth Circuit reaffirmed that each act of copyright infringement "gives rise to an independent claim, and the defendant 'is only liable for his acts of infringement committed within three years prior to [p]laintiff's lawsuit.'" *Id.* at 353 (brackets in the original) (quoting *Makedwde Publ'g Co.*, 37 F.3d at 182).  The issue in *Jaso* was whether a 2011 copyright suit against Coca-Cola for certain advertisements featuring the plaintiff's song was untimely.  Coca-Cola argued that because the advertisements ended in 2000, the plaintiff's claims accrued, at the latest, in 2000.  *Id.* at 350.  Even though the plaintiff alleged that Coca-Cola infringed the song's copyright from "1994 to present," the district court granted Coca-Cola's motion to dismiss and denied the plaintiff leave to amend, reasoning that the plaintiff could not cure the limitations bar.  *See id.* at 350–51.  The district court accepted as true Coca-Cola's claim that it had not used the plaintiff's song after 2000.  The Fifth Circuit reversed, holding that the district court erred when it accepted as true that Coca-Cola's use of the song ended in 2000, despite the plaintiff's allegations that the acts of infringement continued.  *Id.* at

353–54.   At the motion-to-dismiss stage, the district court should have accepted as true the plaintiff's allegation that infringement had continued to the present.  *See id.*

*Jaso* is not inconsistent with the Second, Sixth, and Ninth Circuit cases holding that when a copyright-infringement claim turns on ownership as opposed to copying, the claim accrues when the ownership dispute arises, not when the last alleged infringement occurs.  By contrast, in copyright lawsuits in which ownership is not disputed, all circuits—including the Second, Sixth, and Ninth—agree that each act of infringement is a distinct harm.  *See, e.g.*, *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992) ("Each act of infringement is a distinct harm giving rise to an independent claim for relief.");  *Bridgeport Music*, 376 F.3d at 621 ("Because each act of infringement is a distinct harm, the statute of limitations bars infringement claims that accrued more than three years before suit was filed, but does not preclude infringement claims that accrued within the statutory period.");  *Roley v. New World Pictures, Ltd.* 19 F.3d 479, 481 (9th Cir. 1994) ("In a case of continuing copyright infringements, an action may be brought for all acts that accrued within the three years preceding the filing of the suit.").  In *Jaso*, there was no dispute that the plaintiff was the copyright holder.  *Jaso* is not on point with this case, in which the central dispute is over who owns the disputed work, not over copying.

There is no basis to predict that the Fifth Circuit would depart from the rule in *Seven Arts*, *Kwan*, and *Roger Miller Music*.  Courts are reluctant to create circuit splits "in the realm of copyright."  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 890 (9th Cir. 2005) (en banc) (stating that "the creation of a circuit split would be particularly troublesome in the realm of copyright"); *see also Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002) ("Congressional intent to have national uniformity in copyright laws is clear."); *cf.*

*Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 749 (1989) ("Congress' paramount goal in revising the 1976 Act [was] enhancing predictability and certainty of copyright ownership.").

Sanchez also argues that a recent Supreme Court case, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014), is inconsistent with *Seven Arts*.  (Docket Entry No. 99).  In *Petrella*, the Supreme Court ruled that the defendant could not invoke laches to preclude adjudication of a damages claim brought within the Copyright Act's three-year limitations period.  *Petrella*, does not, as Sanchez suggests, "closely follow the case at hand."  (Docket Entry No. 99 at ¶ 3). *Petrella* addressed the separate-accrual rule for copyright infringement claims.  The case did not involve or address the type of ownership dispute at issue in *Seven Arts* and in this case.  *Petrella* did not discuss the effect of a time-barred copyright ownership claim on a related infringement claim.  The opinion did not mention or cite *Seven Arts*.  *Petrella* does not affect the consistent and persuasive authority of *Seven Arts*, *Kwan*, *Ritchie*, or the analysis of the determinative issues in this case.

### B.     Whether Sanchez's Claims are Time-Barred

The summary judgment evidence establishes that an ownership dispute concerning *La Prieta Casada* has existed since at least 1995, meaning that Sanchez's copyright claims accrued in 1995 and the limitations period expired in 1998.

Three copyright registrations between 1976 and 1994 show three different owners of *La Prieta Casada*'s copyright.  The 1976 copyright registration shows Hererra and Jedasa as the song's publisher and copyright holder.  (Docket Entry No. 41, Ex. U at 19; Docket Entry No. 31, Ex. B at 3).  This registration credited Sanchez as only the song's author.  The 1984 copyright registration shows San Antonio Music as the copyright owner.  (Docket Entry No. 41, Ex. N at

17).  The 1994 copyright registration shows Sanchez as the copyright owner.  (Docket Entry No. 31, Ex. B at 8).

Questions about the song's copyright ownership resulted in the 1995 lawsuit Sanchez filed.  Hacienda had sent a letter on May 4, 1995 to the three parties who had registered a copyright for the song—Jedasa, San Antonio Music, and Sanchez.  (Docket Entry No. 28, Ex. I at 1).  The letter was also sent to Sanchez's attorney.  In this letter, Hacienda stated that it would pay Jedasa royalties for mechanical licenses to *La Prieta Casada*.[4]  (*Id.*).  On September 20, 1996, Hacienda sent Jedasa a check for $1,050.55 for Hacienda's use of *La Prieta Casada* between January 1, 1995 and January 31, 1996.  (*Id.*, Ex. I at 2, 5).  There is no evidence in the record suggesting that Jedasa did not acknowledge or accept the check.

Hacienda's announced payment of royalties to Jedasa instead of Sanchez openly and expressly repudiated any ownership claim Sanchez asserted in *La Prieta Casada*.  The First Circuit's decision in *Santa-Rosa v. Combo Records*, 471 F.3d 224 (1st Cir. 2006), is instructive on this point.  The First Circuit stated that a claim for declaratory judgment of ownership accrued when the defendant record label failed to pay royalties to the plaintiff, the purported copyright owner.  *Id.* at 227–28.  The court held that because the defendant was openly selling the plaintiff's work and not paying him royalties, the defendant repudiated the plaintiff's copyright. The court explained:

> [W]e cannot think of a more plain and express repudiation of co-ownership than the fact that Combo openly, and quite notoriously, sold Santa Rosa's records without providing payment to him: according to documents provided by Santa Rosa, at least 1,140 of

---

[4] Under 17 U.S.C. § 115, a song's words and music that has been reproduced in phonorecords with the permission of the copyright owner may be reproduced in phonorecords by another person, if that person notifies the copyright owner and pays a royalty fixed by law.  *EMI Entm't World, Inc. v. Karen Records, Inc.*, 603 F. Supp. 2d 759, 762 (S.D.N.Y. 2009) *amended on reconsideration in part*, 681 F. Supp. 2d 470 (S.D.N.Y. 2010).  The right to reproduce is called a "mechanical license."  *See id.*

the recordings in dispute were sold during the six month period between January and June of 2000, almost four years before Santa Rosa filed suit in May 2004. Likewise, it is hard to believe that a singer of Santa Rosa's stature would have been unaware that Combo Records was selling his recordings and thus claiming ownership over them until three years before this action was commenced.

*Id.* at 228.

The material facts in the present case are similar. Hacienda, like the record company in *Combo Records*, sold the song that Sanchez purported to hold the copyright to without paying him royalties. Hacienda notified both Sanchez and his attorney that it was paying Jedasa royalties for mechanical licenses to the song. Hacienda paid Jedasa royalties under mechanical licenses even though Hacienda was aware that Sanchez had claimed at least once that he owned the song and registered a copyright for it. Hacienda told Sanchez and his lawyer in writing what it was doing. Hacienda's conduct repudiated Sanchez's copyright ownership in *La Prieta Casada*, and recognized Jedasa's ownership. The fact that Hacienda was not a coowner of the copyright is a distinction without a difference.

Sanchez cannot claim that he was unaware that Hacienda was distributing *La Prieta Casada*. He testified in his deposition that in 1995 he bought Albert Zamora's CD containing *La Prieta Casada*, which Hacienda had released; Sanchez testified that he knew that Hacienda had recorded the song. (Docket Entry No. 41, Ex. E at 65, 70). Sanchez also testified that he asked Roland Garcia Sr., the CEO of Hacienda, about royalty payments for the song. According to Sanchez, Garcia said that Hacienda "do[es] not pay royalties to anyone." (*Id.*, Ex. E at 65, 135).

Sanchez's copyright claim against Hacienda accrued no later than May 4, 1995, the date Hacienda sent the letter to Jedasa, San Antonio Music, and Sanchez stating that it would pay royalties to Jedasa and not Sanchez. At that point, Sanchez was aware of the facts that form the basis of this copyright action. Indeed, on June 1, 1995, less than one month after Hacienda's

letter, Sanchez sued Herrera and Jedasa in federal district court alleging copyright ownership to *La Prieta Casada* and seeking infringement damages. In that lawsuit, Herrera's answer stated that San Antonio Music and others had made ownership claims, and that Jedasa had obtained a report from Hacienda about its recordings of the song. (Docket Entry No. 41, Ex. D at 2). This filing is further evidence that Sanchez was on notice that Hacienda was recording and distributing *La Prieta Casada*.[5] Because the ownership-based copyright claim accrued in May 1995, the three-year limitations period ended in May 1998, over a decade before Sanchez filed the present suit. *See* 17 U.S.C. § 507(b). Limitations bars Sanchez's suit.

Sanchez's argument that the "gravamen" of this suit and the disputes over *La Prieta Casada* do not concern copyright ownership is unpersuasive. (Docket Entry No. 88 ¶ 16). Sanchez's own pleadings in the 1995 case and in the present case make clear that this is at bottom an ownership dispute. In his 1995 lawsuit against Jedasa, Sanchez stated that the "case involves a dispute about the *ownership* of the copyright [for] . . . 'La Prieta Casada.'" (Docket Entry No. 41, Ex. B at 1) (emphasis added). In Sanchez's deposition testimony in the present case, he testified that he sued Herrera and Jedasa because Herrera "wanted to take over my song and that song was mine and I didn't want that." (Docket Entry No. 41, E at 107). The ownership dispute arises from ownership claims asserted by Sanchez, Jedasa, and San Antonio Music. The authorized use question turns on whether and when Hacienda obtained a license from the rightful owner. The dispute is not about copying and distribution, because Hacienda does not dispute that it recorded and distributed the song. The dispute instead concerns whether the copyright holder authorized Hacienda to do so.

---

[5] Sanchez also emphasizes that Hacienda Records was not "involved" in any ownership dispute, as the studio was not a party to the 1995 lawsuit. (Docket Entry No. 88 at 2). Neither *Seven Arts* nor any other relevant precedent suggests that this would change the analysis as to whether Sanchez's claims are time-barred.

Even though the 1995 lawsuit settled, the parties were still unclear about who owned the song.  In 2010, 15 years after the 1995 lawsuit settled, Jedasa assigned Sanchez any remaining rights to *La Prieta Casada* that Jedasa might have owned.  Hacienda has alleged from its earliest motions in this case that it obtained licenses from the party that it believed to hold the copyright for *La Prieta Casada*—either Jedasa or San Antonio Music—before using the song.  The gravamen of the dispute is ownership.

It is true that in October 2011, Hacienda sent Sanchez a check for royalties for its recent uses of *La Prieta Casada*, but this was not a concession that Sanchez was the song's rightful copyright owner or that Hacienda was giving up any claim that it had to use the song.  In a letter accompanying the payment to Sanchez's attorney, Hacienda stated that it is "highly doubtful that Mr. Sanchez is the original composer of the song," but it was making the payment "in a spirit of good will, time efficiency, and an effort to do the right thing."  (Docket Entry No. 28, Ex. L at 2).  The payment does not indicate that the ownership dispute has been resolved.

Moreover, the 2010 assignment and the 2011 payment are immaterial because limitations had expired long before those two events occurred.  As noted above, Sanchez's claims accrued in May 1995, when Hacienda repudiated Sanchez's ownership by sending the letter and paying Jedasa royalties.  The three-year limitations period expired in 1998, well before the 2010 assignment and 2011 payment.

IV.     **Conclusion**

Hacienda's motion for summary judgment, (Docket Entry No. 83), is granted.[6]   By **September 8, 2014**, the parties must file a statement identifying any issues that remain to be resolved or a proposed final judgment.

SIGNED on August 26, 2014, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

---

[6] In light of the court's ruling, Hacienda's motion to strike Wayne Coleman's testimony, (Docket Entry No. 85), and Sanchez's motion to strike Hacienda's reply, (Docket Entry No. 101), are denied as moot.